## Bernheim, et al. v. Duane, et al.

(Decided June 19, 1925.)

Appeal from Jefferson Circuit Court
(Chancery Branch, First Division).

1.  Corporations—Evidence Held Not to Show That Franchise of Chain Store Corporation Was Without Value.—Evidence, in action for balance due on sale of stock at book value, which defendants claimed was not intended to include book value of good will, held not to show that franchise to use the "Piggly Wiggly" system was without value.

2.  Reformation of Instruments—Reformation of Written Contract for Mutual Mistake Not Justified, Unless Evidence Clear and Convincing.—Reformation of written contract for mutual mistake is not justified, unless evidence is clear and convincing or such as to establish mistake beyond reasonable controversy.

3.  Reformation of Instruments—Evidence Held Not Sufficiently Clear and Convincing to Justify Reformation of Contract for Mutual Mistake.—Evidence held not clear and convincing that words

"book value" as used in contract for sale of stock of chain store organization, were not intended to include value of organization's franchise carried on its books as "good will," and hence reformation was not justified on ground of mutual mistake:

LAWRENCE S. LEOPOLD for appellants.

BRUCE, BULLITT & GORDON and JOSEPH S. LAURENT for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

The Piggly Wiggly corporation owns the franchise to operate stores under the Piggly Wiggly name and system, and sells territory for these rights. The Piggly Wiggly stores, incorporated, is an operating company which leases the territory from the Piggly Wiggly corporation, and operates certain stores in certain territory. The Piggly Wiggly Valley Company, a Kentucky corporation, was organized by W. M. Duane, Lewis Cole and others, for the purpose of leasing the right from the Piggly Wiggly corporation to use its name and system in the operation of stores in Cincinnati and Kentucky territory. Prior to the organization of the valley company, E. B. Duane operated certain stores in Cincinnati, Covington and Newport, and Clarence Saunders, the originator of the Piggly Wiggly system, operated two stores in Louisville. On April 10, 1919, a contract was entered into between the Piggly Wiggly corporation, W. M. Duane, Lewis Cole and Clarence Saunders, whereby the Piggly Wiggly corporation sold to Duane and Cole the exclusive rights for the entire state of Kentucky, except the cities of Owensboro, Henderson, Madisonville and Hopkinsville, and the exclusive rights for the entire city of Cincinnati, together with all territory within a radius of fifty miles of both Louisville and Cincinnati. In the same contract Saunders sold to Cole the two Louisville stores. The contract further provided for the organization of the valley company, and contained an agreement on the part of Duane to convey to it the Cincinnati territory, and on the part of Cole to convey the two Louisville stores. In closing the trades the valley company paid Cole $2,863.19, and Duane $7,500.00 for their franchises, but the entire franchise was placed and carried on the books at $60,363.19. Early in the month of July, 1920, the valley company sold its physical assets and Cincinnati rights to Clarence Saunders for a price that included a franchise value of $15,000.00. Shortly after

this deal was closed, W. M. Duane began negotiations with Cole for the sale of his stock. The negotiations resulted in the execution of a contract on July 10, 1920, between W. M. Duane and E. B. Duane, parties of the first part, and I. W. Bernheim and L. W. Cole, parties of the second part. The material provisions of the contract are as follows:

"That whereas the parties of the first part have this day made to second parties a proposition to sell to second parties four hundred and ten (410) shares of the capital stock of Piggly Wiggly Valley Company, said shares constituting all the holdings of first parties in said corporation, said first parties agree that they will sell said stock as of the book value of said stock on the books of said corporation as of July 1, 1920; that as the book value of said stock cannot be determined immediately, first parties agree to accept at the present time, in consideration of the transfer by them to second parties of said stock, the sum of forty-one thousand dollars ($41,000.00), this being the par value of said stock, the remainder, if any, due to first parties, being the difference between par value and book value, shall be paid by second parties to first parties as soon as the book value of said stock can be determined.

"Payment for said stock shall be in the following manner: First parties shall draw upon second parties through the National Bank of Kentucky, Louisville, Ky., for the sum of forty-one thousand dollars ($41,000.00) and shall attach to said draft said four hundred and ten shares of stock of the Piggly Wiggly Valley Company, endorsed for transfer to I. W. Bernheim and L. W. Cohn, (now Cole) with instructions to said bank that upon the payment of said draft the four hundred and ten shares of stock shall be delivered to second parties or either of them.

"Second parties hereby accept the foregoing offer in all of its terms and conditions and agree that they will comply with the terms thereof; and further bind themselves that the inventory of the stock of the Piggly Wiggly Valley Company shall be completed in such time as will permit of a final settlement with first parties not later than August 1, 1920, on the purchase of the stock herein provided for."

At the same time W. M. Duane and L. W. Cole executed the following agreement:

"THIS MEMORANDUM OF AGREEMENT between W. M. Duane and L. W. Cohn (now Cole) WITNESSETH:

"That in determining the book value of capital stock referred to in an agreement of this date whereby W. M. Duane agrees to sell four hundred and ten shares of stock in the Piggly Wiggly Valley Company to I. W. Bernheim and L. W. Cohn, it is agreed that each party shall accept the book value of the assets of said company as now appearing on the books of the company as of July 1, 1920, with the exception that depreciation of five per cent shall be allowed on equipment and improvements in stores known and designated as Nos. 1, 2, 3 and 4, Louisville, Kentucky, shown on said books as of January 1, 1920, and no other depreciation shall be allowed."

Upon the execution of the contracts the Duanes transferred their stock to Bernheim and Cole, and the cash consideration of $41,000.00 was paid.

Being unable to agree on the amount, the Duanes brought this suit to recover the balance due under the contract. In addition to denying certain averments of the petition, the answer presents the following defense:

"Further answering defendants and each of them state that at the time they and plaintiffs entered into the contracts set out in plaintiff's petition, it was agreed and understood between the parties that the book value of said stock should be shown and based entirely on the value of the merchandise, fixtures and other tangible assets of the corporation, plus actual profit accrued from business operations from the time of commencement of business by the corporation to July 1, 1920, and that in order to arrive at the value of said assets it would be necessary for a full inventory of the stock to be made and balances struck for the purpose of determining what, if any, profits had been earned by the corporation.

"Defendants state that an item of good will had been carried on the books of said corporation at and from the time of the formation of the corporation, said good will being fixed at an arbitrary valuation

of $50,000.00, and that said arbitrary valuation of good will appeared on the books of said corporation on July 1, 1920; and defendants stated that in agreeing with plaintiffs on the purchase price of said stock at its book value as of July 1, 1920, it was agreed and understood between all the parties that the only values to be included in the book value of said stock would be tangible assets as shown by an inventory, whether or not said assets represented original investments or accrued profits and the tangible assets only were to be considered in arriving at the book value as of July 1, 1920.

"Defendants and each of them state that, by mutual mistake, the basis of computing the book value of said stock was omitted from the contract as reduced to writing, and that by reason of said omission plaintiffs are now claiming that the book value of said stock as of July 1, 1920, includes the amount shown on the books as good will and the basis of plaintiff's alleged claim herein is on account of the item shown on the books of the corporation as good will, which was an arbitrary amount carried on the books and was mutually known to the parties as not representing any paid in capital or earned assets."

Some time later the answer was amended as follows:

"Defendants, for amendment to their answer herein, state that in the use of the phrase, 'tangible assets' they meant, and it was at all times meant, assets having a tangible value as distinguished from the $50,000.00 item of 'good will' or 'franchise' arbitrarily placed on the books, as set out in their answer herein, and that the agreement between plaintiffs and defendants was that only the actual assets of the business, such as fixtures, merchandise, bills and accounts receivable, cash on hand and in bank, rolling stock and other like assets, were to be inventoried, the basis of computation being the actual amount of the investment by plaintiffs, plus their capital stock's proportion of the profits which had been actually made by the corporation from time of the organization up to and including July 1, 1920, and that it was in reference to actual assets as above stated, that the term 'book value' was used in drafting the contract, but that by mutual mistake this basis for computation was not specifically set out in

said contract, and that this was the agreement that should have been incorporated in said contract, but that by mutual mistake, the bare phrase 'book value' was used.''

The case was referred to the commissioner, who, after hearing the evidence, filed a report rejecting the theory of mutual mistake as to the franchise item, and sustaining practically all the contentions of appellees. On exceptions, the commissioner's report was confirmed except as to two items, one of $10.00 and the other of 2 cents, and judgment was rendered in favor of plaintiffs in the sum of $20,799.89, with interest from August 1, 1920, until paid. From that judgment this appeal is prosecuted.

The facts are these: Before the execution of the contracts sued on, Mr. Cole went to Cincinnati and he and Mr. Duane reached an agreement as to the sale of the stock. Mr. Duane had his attorney prepare a contract and submitted it to Mr. Cole. In that contract the valley company was to become the purchaser. Duane says that Cole's only objection to the contract was that the valley company was to be the purchaser. Cole says that he had other objections to the contract. At any rate, the contract was not signed, and Cole and Duane went to Louisville. As to what occurred in Louisville, Mr. Bernheim says: ''I can't tell you the exact date but at the time when these negotiations were taking place, Mr. Cole and Mr. Duane came into my office, which is next door here, and just in a short way we had a conversation in which it was agreed that we would take inventory of all the tangible assets and settle on that basis.'' Again he says: ''There wasn't any agreement; there was just simply a short understanding that we were to take stock of all the tangible properties and we were to settle on that basis; that was all the agreement that I remember.'' He also admitted that the system and name had some value over and above the tangible assets, but stated that the value was very little and of no such dimension as Duane claimed.

In his first deposition Mr. Cole stated the agreement as follows:

''We were to take an inventory of our stock which constituted our goods in our warehouse and in all of our stores. We were to take in our fixtures and improvements that we had made in all of our

stores, in other words, all of our physical, live assets.''

In his deposition before the commissioner, Mr. Cole said:

"The agreement was that we were to pay Mr. Duane what money he had put in and whatever profits had accrued."

Later on he explained the use of the words, "tangible assets" by saying that they didn't mean physical assets, but meant something that you could realize on, something that you have paid for. He further said that the words included open accounts, or bills receivable, were not confined to the actual fixtures or the actual stock of goods on hand, but included the amount that had been actually paid for the franchise.

As to his recollection of what occurred, Mr. Washer's testimony is as follows:

"A. The contract which had been drawn by the Cincinnati lawyer was, as I have said, submitted to me. I have not seen that contract since, but I believe that original contract provided that the sale price should be 'book value.' I probably read that at the time that the Cincinnati contract was submitted to me. I asked them then just how they were going to arrive at the fixed price at which this stock was to be sold per share, and was then told that there would be no trouble about a portion of it, that they knew the stock was worth at least par, and that Mr. Cole and Mr. Bernheim would be agreeable, as they had promised Mr. Duane to pay him at once some forty or forty-one thousand dollars, which was the par value of the stock holdings of himself and son, and that the remaining price in addition to par would and could be arrived at only after an inventory of the assets of the company was taken. It was very clearly indicated to me that the purpose was to take a detailed inventory of the assets of the company, and to arrive at the stock value from that inventory. I believe there was some reduction required or agreed upon on the fixtures for depreciation. I don't remember what that was, but, anyway, the attitude of Mr. Duane was, and seemed to have been agreed on between the two, that all he wanted, all

he expected of this transaction was the money which he had placed in the company for his original stock and the profits which had accrued to him, and which would be ascertained by the taking of the inventory of assets on hand.

"13. You say the profits that had accrued to him— A. Or to the company, I should have said, which would be represented by his stock holdings.

"14. Were those profits, profits that had accrued from enhancement of franchise, or just what was said about these profits? A. There was nothing said to me at all about franchise, or any statement of franchise as it may have appeared on the books of the company. I knew nothing of any franchise valuation on the books of the company. Neither Mr. Duane nor Mr. Cole said anything about it at all. The profits to which I have just referred were the profits, as I understood, which had actually accrued from the operation of the business and which had accumulated by reason of that operation.

"15. Then, to put it in a concrete question, you mean that he was to be paid actual moneys that he had paid in, plus the proportion his stock bore to the actual profits that had been made by the company from operations? A. Precisely. As I understood their instructions when I drew the contract, it was as if the company were preparing to liquidate and they were going to divide up everything that the company had on hand, relatively and proportionately to the stock holdings of the various members of the corporation, regardless of any franchise value, because nothing was said of that at all.

"16. Had you ever heard of this item of $50,000.00 franchise which actually was on the books at the time? A. As I have stated, neither Mr. Duane nor Mr. Cole mentioned it, nor had I ever heard of it from any other source. Had I have known that there was such an item on the books, I would, of course, have made reference to it in the contract which I drew and in which I, perhaps erroneously, certainly through misunderstanding of the desires of the parties, used the word 'book value,' when I would have used, had I known of that item and receiving the instructions that I did, 'book value' less any items that were carried upon the books for inventory or good will.

"17. Had you known of this item, would you have used the term 'book value' or 'book assets' at all? A. Under the instructions which I got as to the preparation of the contract, and as I understood the purposes of the parties, I could not have used the word 'book value' had I have known of this item. I might have used the word 'book value,' but I would have qualified it by eliminating from that value the $50,000.00, which I am now informed was carried upon the books as the good will or franchise valuation."

Mr. Ryan, the bookkeeper, states that when Cole and Duane came to him for the purpose of arriving at a settlement, the conversation was that the settlement was to be on the basis of what Duanes had put in, plus what the company had received in the way of profits up to that time. In figuring the actual value of the stock he did not include the $50,000.00 item. However, he stated that Duane had the item on a memorandum with a large question mark after it, and admitted that Duane contended that the item should be considered.

There was further evidence that a few sales of stock had been made at prices a little above par. Mr. Bernheim says that he would have been a fool to pay the price now claimed by Duane when he could have purchased the stock at a less price.

On the other hand, W. M. Duane says that he never agreed nor stated to Mr. Cole, Mr. Washer, Mr. Ryan, or anyone else, that he was willing to sell his stock for the money he had put in the business, plus the profits which had accumulated from operation. He further testifies that Mr. Saunders had written the valley company proposing to buy out the company and pay a bonus of $35,000.00 for its franchise, but the proposition was declined. Afterwards a proposition was made to buy the Cincinnati territory at a bonus of $15,000.00, and this was accepted. The franchise item was not only carried on the books, but was included in every statement issued by the company, and in his opinion, the value was not overstated.

The position of appellants may be summarized as follows: The valley company paid only $10,363.19 for its franchise. Without anything of value being added to the franchise an arbitrary entry of $50,000.00 was placed on the books as additional value. When the sale of stock

at its book value was made, no mention was made to the draftsman of the arbitrary item of $50,000.00 appearing on the books. Hence, the $50,000.00 item should not represent that much 'book value' and even if 'book value' should be held to mean all entries appearing on the books of the corporation, there was a mutual mistake in using this term. Furthermore, the evidence shows that the parties did not contemplate that the item of $50,000.00 should be used in placing the valuation on the capital stock. In support of this position they rely not only upon the testimony of the witnesses, but the additional circumstances that nothing was paid for the franchise except the sum of $10,363.19; that the stock was earning only about 5%, and that they could have purchased stock from the corporation at a sum much less than the Duanes would receive, if the $50,000.00 item should be considered in valuing their stock. The evidence leaves no doubt that a *bona fide* offer of $35,000.00 was made for the franchise, and that this offer was refused. It is claimed that this is not a fair test of the value of the franchise as it was more valuable to the Piggly Wiggly stores, incorporated, because it constituted a unit in a great system, and that company could, therefore, afford to pay more than its real value. However this may be, it is clear that beyond all dispute that both Duane and Cole regarded the offer as insufficient. While one of the reasons given by Cole for the rejection of the offer was that he had been out of business for fifteen months and did not care to accept the position offered to him, he also says "and I had hopes of at some time making me more, far more than my portion of $35,000.00. Moreover, there was a *bona fide* sale of the Cincinnati franchise for $15,000.00, which was $7,500.00 more than the franchise cost, and $4,636.81 more than the cost of the Louisville and Cincinnati franchises combined. Even Mr. Bernheim admits that the franchise had some value, though not nearly so much as claimed by Duane. Furthermore, it is at once apparent that as the Piggly Wiggly name and system were favorably known, the right to operate thereunder in certain territory carried with it certain advantages in the form of advertising, as well as in the matter of discounts on purchases, and the method of making sales, which the valley company would not have enjoyed had it been conducting the same business in the ordinary way, and under some other name. Therefore, the contention that the franchise was without value can not be sustained,

and as its value was carried on the books at $50,000.00, with the knowledge of all the parties to the contract, and was treated and considered as an asset in all the statements made by that company, there is no reason why it should not be included in the book value unless there was a mutual mistake in the contract, a question which we shall proceed to consider.

To entitle one to a reformation of a written contract on the ground of mutual mistake, the evidence must be clear and convincing, or such as to establish the mistake beyond reasonable controversy. Johnson v. Elkhorn Gas Coal Mining Company, 193 Ky. 585, 236 S. W. 1040. In the light of this rule, let us examine all the facts and circumstances shown by the evidence. On the one hand we have a written contract in which the words "book value" are used four different times, followed by the supplemental agreement which uses the words "book value" twice, and provides that each party "shall accept the book value of the assets of said company *as now appearing on the books of the company* as of July 1, 1920," with the exception of a 5% depreciation on equipment and improvements in certain stores in Louisville, and Duane says that the contract represents the true agreement. On the other hand we have the statement of Mr. Bernheim that the agreement was that they would take an inventory of all tangible assets and settle on that basis; the first statement of Mr. Cole that the settlement was to be based on physical, live assets, accompanied by the explanation that tangible assets represented assets that cost money, or could be realized on; the second statement of Mr. Cole that the agreement was to pay Mr. Duane what money he had put in, and whatever profits had accrued; Mr. Washer's statement that he gathered from the conversation that all Mr. Duane expected of the transaction was the money which he placed in the company for his original stock and the profits which had accrued to him, which were to be ascertained by the taking an inventory of the assets on hand; that according to his instructions when he drew the contract, it was as if the company was preparing to liquidate, and they were going to divide up everything that the company had on hand, relatively and proportionately to the stockholdings of the various members of the company, regardless of the franchise value because nothing was said about that; and that he would not have used the words "book value" if he had known that the franchise item

of $50,000.00 was carried on the books, and the statement of Ryan that when the parties came to him in November with the view of a settlement they told him that Duane was to receive the par value of his stock, plus the accumulated profits. There is also the additional circumstances that the company was selling stock at or around par, and stress is placed on the fact that appellants would not have purchased from Duane at a much higher price.

None of the witnesses for appellants attempted to give what was actually said by the parties to the contract, and it is apparent from their testimony that they were giving their construction of the contract, rather than what was actually agreed on between the parties. As intangible assets amounting to several thousand dollars were carried on the books of the company, it hardly can be that the parties contemplated that these assets should be excluded. Moreover, a settlement based on a division of the assets as if in liquidation would eliminate all the advantages accruing from the good will of a going concern, as well as the franchise item of $10,363.19, which actually cost the company that amount, and which Cole himself admits should be included. Furthermore, a settlement based on tangible assets, even though embracing all assets which cost money and could be realized on, would not necessarily be the same as a settlement based on what the Duanes had paid for their stock, plus the accumulated profits. Nor is the circumstance that appellants could have purchased stock from the company at or around par, of much weight in determining the question of mistake. At the time of the sale the outstanding stock amounted to 1,440 shares of the par value of $100.00. Therefore, by the purchase of the Duane stock appellants acquired 410/1440 of the corporation, whereas, if they had bought the same amount of stock from the company they would have acquired only 410/1850 of the corporation, from which it necessarily follows that the Duane stock was the more valuable of the two. It may be that appellants did not contemplate that the $50,000.00 franchise item would be included in the settlement; it may be that the draftsman would not have used the term "book value" if he had known that the item was on the books; but the question is not what appellants intended, or what the draftsman would have done, but what was the real agreement between all the parties to the contract. When we consider the conflicting evidence, and inconsistent

theories as to the terms of the agreement, coupled with the fact that the words "book value" were repeatedly used in the contract, and that the parties took the pains to prepare a supplemental agreement, which restated the book value as the basis of the settlement, and provided for a 5% depreciation on equipment and improvements in certain stores in Louisville, thus showing that the words "book value" were employed advisedly, and not by inadvertence, we are constrained to agree with the chancellor that the evidence falls short of the standard necessary to show a mistake in the contract.

We have carefully examined the other items in dispute and find no reason to disturb the finding of the commissioner as approved by the chancellor.

Judgment affirmed.